## MATHESON et al. v. PATENAUDE et al.
### No. 2789.

First Division. Juneau.
April 25, 1930.

James Wickersham, of Juneau, for plaintiffs.
William L. Paul, of Juneau, for defendants.

HILL, District Judge.

This is a suit in equity brought by the plaintiffs as owners of a judgment against Leo C. Patenaude. The prayer of the complaint is that certain conveyances of real property situated in the town of Wrangell, Alaska, made by Leo C. Patenaude to Mary I. Patenaude, his wife, be declared fraudulent and void as against plaintiffs; that Mary I. Patenaude be enjoined from disposing of, incumbering, or wasting the real property so conveyed to her; that a receiver be appointed to whom said Mary I. Patenaude shall be required to convey said real property; and that said receiver shall sell enough of said property to pay plaintiffs' judgment. The action in which plaintiffs recovered judgment against Leo C. Patenaude was commenced April 25, 1927, and was based upon the defendant's liability as indorser of certain promissory notes owned by plaintiffs, which notes have not been paid by the makers thereof.

Plaintiffs claim that the conveyances recited in their complaint, from Leo C. Patenaude to Mary I. Patenaude, were made for the purpose of hindering and defrauding creditors of the said Leo C. Patenaude and are void under the provisions of sections 556 and 559, Compiled Laws of Alaska, which are as follows:

"Sec. 556. Every conveyance or assignment, in writing or otherwise, of any estate or interest in lands, or in goods, or things in action, or of any rents or profits issuing therefrom, and every charge upon lands, goods, or things in action, or upon the rents or profits thereof, made with the intent to hinder, delay, or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts, or demands, and every bond or other

evidence of debt given, action commenced, decree or judgment suffered, with the like intent, as against the persons so hindered, delayed, or defrauded shall be void."

"Sec. 559. The question of fraudulent intent in all cases arising under the provisions of this code shall be deemed a question of fact, and not of law."

Leo C. Patenaude and Mary I. Patenaude were married in 1893. At the time of her marriage, she had no money, and she did not afterwards inherit money; she and her husband came to Wrangell in 1898; Mr. Patenaude was a barber and conducted a barber shop in the town of Wrangell for many years; Mrs. Patenaude had rooms and at one time some kind of a hospital, that is, she took care of sick people; she and her husband, according to her testimony, "worked all the time"; they were frugal and saving and had a joint account in the bank, and from time to time they bought pieces of real estate.

On December 9, 1909, Leo C. Patenaude executed five deeds, and on May 10, 1913, three additional deeds, each conveying to Mary I. Patenaude, his wife, a parcel of real estate in the town of Wrangell—eight pieces in all. These eight deeds were in proper form, entitled to record, and were delivered to Mrs. Patenaude at the time of execution or soon thereafter. She did not record them until June 16, 1927. In explanation of her delay in recording them, she says that Mr. John E. Worden, the notary public who took Mr. Patenaude's acknowledgment, told her that she did not need to record these deeds unless she wanted to sell the property; and she testifies: "I had them in my possession among other valuable papers of mine. I intended when it was necessary to put them on record. It was mine and I didn't go to the expense of putting them on record." These eight deeds will hereafter be referred to as the first deeds.

On the 27th day of September, 1923, Mr. Patenaude deeded to Mrs. Patenaude by separate deeds two additional pieces of real estate in the town of Wrangell. There

is no evidence or, if any, it is very slight, that he delivered these deeds to Mrs. Patenaude at the time they were made or at all, except by filing them for record in the recording office at Wrangell. This he did May 11, 1926. These deeds will hereafter be referred to as the last deeds.

In each of the deeds, both first and last, there is an expressed consideration of $1. Plaintiffs attack all of them and claim that they have established "as facts which should control the court in arriving at a decision in this case" sixteen badges of fraud as follows:

"1. Voluntary transfer of entire property;
"2. By the husband to his wife;
"3. Without present moving consideration;
"4. Leaving the husband wholly insolvent;
"5. Owing large present indebtedness;
"6. Without any funds to pay it.
"7. Husband long the owner of record;
"8. Whereby he had large credit;
"9. Used to create present debts.
"10. Wife kept deeds secret without recording;
"11. Held husband out to public as owner;
"12. Who continued same possession after making deeds.
"13. Wife had no estate except gifts from husband;
"14. Kept no account of alleged payments;
"15. And had full knowledge of fraud.
"16. Result: hinder, delay and defraud creditors."

As to the property deeded by the first conveyances, Mrs. Patenaude testifies that her money paid "nearly all" of the purchase price of the property. She does not specify the particular amounts which she contributed in paying for the property, and shows very little accurate information about the purchases. She further testifies that what her husband earned in the barber shop "went for expenses, living and everything in that line." Mr. Patenaude testifies as to one piece of property that he took it in payment

of $760 that was due him, and, as to the property generally, that it was paid for from the joint account he and his wife had in the bank. The defendants' affirmative answer sets up "all the property mentioned in the complaint was the community property of the defendant Leo C. Patenaude and Mary I. Patenaude, purchased by the earnings of both defendants after marriage." I think a fair deduction from the testimony is that the Patenaudes' earnings were pooled and that these properties were not purchased with the separate funds of Mrs. Patenaude.

When the first deeds were made, the Patenaudes were not indebted to any one beyond current bills. For about ten years after the last deeds were executed, they had no indebtedness and sought no credit. Then, in January, 1923, John P. Walker and Charles W. Russell purchased from the plaintiffs, who were minors acting by their guardian John G. Grant, a stock of goods in the town of Wrangell, Alaska, paying one half of the purchase price in cash and giving promissory notes for the other half. Those promissory notes, the purchasers asked Mr. Patenaude to indorse, and he did so. In answer to the question, "Did any of these persons (Mr. Walker, Mr. Russell, and Mr. Kehoe, attorney for the Matheson estate) ask you if you had any property of any description?" he testified, "Never asked me a thing about it." This testimony was not disputed. Mr. Grant testified that Walker and Russell asked him if Patenaude would be satisfactory as indorser; that he said Patenaude would be, and made no investigation as to Patenaude's property before Patenaude signed the notes. He also testified that, when the notes were signed, he was mayor of Wrangell and knew that Patenaude had considerable property standing in his name. The notes which Mr. Patenaude indorsed were for $1,-000 each, and were payable at intervals of a year. The makers paid the notes that came due January 17, 1924, and January 17, 1925. When the third became due on January 17, 1926, they paid the interest on the remaining notes and $250 and no more on the third note. The evi-

dence fails to show that Mrs. Patenaude knew of the indorsement of these notes at any time prior to the time when she put the first deeds of record, and there is no evidence to show that Mr. Patenaude, prior to January, 1926, believed, or had any ground to believe, that Walker and Russell would not pay their notes as they fell due.

From the foregoing, it follows that I cannot agree with the plaintiffs' contention that their enumerated badges of fraud have been proven by the testimony. Badges of fraud at most are only evidentiary facts tending to prove the ultimate fact, which is that fraud was intended.

As indicating the principles of law which should be applied in this case, counsel cites Callan v. Statham, 23 How.(64 U.S.) 477, 478, 16 L.Ed. 532; Humes v. Scruggs, 94 U.S. 22, 26, 24 L.Ed. 51; Seitz v. Mitchell, 94 U.S. 580, 24 L.Ed. 179; Crawford v. Neal, 144 U.S. 585, 12 S.Ct. 759, 36 L.Ed. 552; Collinson v. Jackson (C.C.) 14 F. 305; and Platt v. Schreyer (C.C.) 25 F. 83, with quotations of general statements from each. In each of these cases conveyances were held fraudulent. But an examination of the facts shows a wide variance between them and the case at bar, except in the case of Platt v. Schreyer, supra. In Callan v. Statham, the condition, at the time of making the deed which was set aside, is stated by Mr. Justice Nelson thus: "At the date of the deed of October, 1854, Callan was heavily in debt—several suits impending over him and maturing to judgments, to which the property in question would have been subject."

In Humes v. Scruggs, Mr. Justice Hunt says, in referring to the time of the execution of the deed declared to be fraudulent: "We may safely assume the total insolvency of the husband at the time of the execution of the deed in question, and, if that is important, that the wife was aware of it."

And later in the opinion he says: "Fraud or no fraud is generally a question of fact to be determined by all the circumstances of the case. If the husband in a state of

absolute bankruptcy conveys to his wife property fairly worth $15,000 to $20,000, with no present consideration passing, but with a recital of past indebtedness to her to less than a fifth of its value, the transaction is fraudulent and void as to creditors."

In Seitz v. Mitchell, the conveyances complained of were made in 1870 when the grantor was insolvent and had hanging over him judgments rendered in 1868. In Crawford v. Neal, the facts were referred to a master who found that Foster, who made the deed attacked, was insolvent when the deed was made. In Collinson v. Jackson, it appears that Jackson was indebted and unable to pay when he made the conveyances attacked, and, on the stand, Jackson admitted that he made those conveyances for the purpose of putting the property conveyed beyond the reach of his creditors.

There is no evidence indicating in any way in the case at bar that, when the first deeds were made, Patenaude was indebted or insolvent.

Of Platt v. Schreyer, counsel says in page 17 of his brief: "A case almost identical with that at bar is Platt v. Schreyer (C.C.) 25 F. 83, arising in New York under section adopted from New York first in Oregon, then in Alaska. The United States District Court there held in accord with the United States Supreme Court in the above quoted cases."

I agree that many of the facts in the Schreyer Case are similar to those in the case at bar. In some respects the cases are almost on all fours, and the Schreyer Case might require my very careful consideration had it not been reversed by the Supreme Court of the United States in Schreyer v. Scott, 134 U.S. 405, 10 S.Ct. 579, 581, 33 L.Ed. 955. In rendering the opinion of the Supreme Court of the United States, Mr. Justice Brewer used language which seems to me exactly pertinent to the case at bar; in fact, if you substitute the name Patenaude for Schreyer and the number 13 for 3, and the years 1909

and 1913 for the year 1871, and the names Walker and Russell for Gebhart and Ritchie, the following quotations from the opinion could be used, without change, in the instant case. Mr. Justice Brewer says:

"Is it possible to suppose that the Schreyers, when they made those conveyances, looked forward three years, and anticipated that Gebhart and Ritchie would seek to improve their real estate, and obtain pecuniary assistance from them, and, with that provision, planned to defraud any one who might rely upon Mr. Schreyer's guaranty? * * *

"It is objected by the appellees that Schreyer's testimony is not to be depended upon, because contradictory, confused, and uncertain; that there is no definiteness in it as to amounts and dates; and that wrong in the transactions is evident, because the moneys received for rent after the conveyances were deposited by Schreyer in his own name, in bank, and were obviously managed and handled by him as his own, as no accounts were kept between husband and wife of their separate moneys, but all were mingled in one fund, in his hands. *But does all this indicate fraud?* If his testimony is worthless, and to be rejected, then there is practically no testimony interpreting those transactions; and the *court never presumes fraud."* (Italics mine.)

Justice Brewer further says, in recapitulation:

"The conveyances in 1871 were meritorious, upon good consideration, made by one in debt in only a trifling sum, and retaining an abundance of property for the discharge of those debts, and who in fact subsequently, and as they became due, paid them; made by one continuing and expecting to continue in the same profitable and not hazardous business in which he had been engaged for nearly a score of years, with no thought of entering upon any new or hazardous business, and more than three years before any liability to Vanderbilt was incurred or even thought of. And the placing of the notes, bonds, and mortgages,

in 1874, in Mrs. Schreyer's name, was in pursuance of an arrangement entered into when the husband was not in debt, and when no obligation, fixed or contingent, to Vanderbilt had been entered into, or thought of.

"Under these circumstances it is error to hold that the transactions were fraudulent and void as against Vanderbilt."

■ ■ The ultimate fact which this court must find before it can grant the prayer of plaintiffs' complaint is that the questioned conveyances were "executed with intent to hinder or defraud creditors." The burden of proof is on the plaintiffs, and the court never presumes fraud. There is no proof in this case to warrant the court in finding as a fact that Leo C. Patenaude made the conveyances in 1909 and 1913 with any intent to defraud creditors.

■ There remains, then, to be considered the effect of Mrs. Patenaude's delay in recording those conveyances. Upon this point counsel cites Davis v. Cassels (D.C.) 220 F. 958, 962, in which Judge Grubb in his opinion says: "It is shown that the conveyances, which concerned the transferred property situated in Alabama, were in fact withheld from record for periods of varying length. This, of itself, would not suffice to show fraud. It is essential that it also appear to have been done with the purpose of falsely sustaining the credit of the grantor, and that this purpose be that of the grantee as well as that of the grantor."

The principles expressed in the last two sentences quoted above from Judge Grubb's opinion are recognized in Manders v. Wilson, 235 F. 878, an opinion of the Circuit Court of Appeals for the Ninth Circuit, also cited by plaintiffs.

There is not one word of testimony to show that Mrs. Patenaude withheld the first deeds with the purpose of falsely sustaining the credit of the grantor. As indicated above, there is no evidence that she knew, until about the time she put the deeds of record, that Mr. Patenaude had assumed any obligations, contingent or otherwise. There

is nothing to indicate that Mr. Patenaude had anything to do with Mrs. Patenaude's delay in recording those deeds. There was no agreement, tacit or expressed, between the Patenaudes that the conveyances were to be concealed for the purpose of sustaining the grantor's credit.

 Passing to the deeds of the 27th of September, 1923, these deeds were made after Mr. Patenaude had indorsed the notes referred to above. There was very little evidence offered as to the properties conveyed by these deeds. Mrs. Patenaude knew very little about them. Her attention was called to one of those deeds conveying lot 4 in block 8 in the town of Wrangell, and she said she remembered the matter, but she did not say that she received the deed. A further examination showed that she remembered almost nothing about it. As to the deed conveying lot 8 in block 4 in said town, she had no recollection whatever; she did not even remember the property. It appears that on May 10, 1926, Mr. Patenaude made eight deeds to Mrs. Patenaude, each covering property which had been deeded to her by the first deeds, and, on May 11, 1926, he filed for record these eight deeds made on May 10, 1926, together with the two deeds made September 27, 1923. According to the testimony, Mrs. Patenaude knew nothing of the making of these deeds of May 10, 1926, and did not know that they were placed on record. The allegation of the answer in that respect is that these deeds were made to correct any errors in description that may have been in the first deeds, and Mr. Patenaude so testified. An examination of the deeds of May 10, 1926, in comparison with the first deeds, shows no material change in the description, except in one instance, I believe, and in that instance the change is made by interlineation.

The circumstances and testimony impress me with the belief that, after signing as indorser on the Walker and Russell notes, Mr. Patenaude became uneasy; that he then made the deeds of September 27, 1923, with the idea that

he would file them for record if he found that he might become liable on his indorsements. I think it highly probable that he did not tell his wife that he had made those deeds. In May, 1926, finding that Walker and Russell would probably fail to pay some of the notes and, knowing that Mrs. Patenaude had not put on record the first deeds, and fearing to tell her the whole truth about the situation, Mr. Patenaude conceived the idea of redeeding to her the properties covered by the first deeds and putting the second deeds to those properties on record. I think Mrs. Patenaude never knew of this transaction until about the time she put the first deeds on record. While the evidence is weak, I am constrained to believe that Mr. Patenaude made the two deeds of September 27, 1923, for the purpose of putting that property out of reach in case the contingent liability on his indorsements of the Walker-Russell notes became an actual liability. As soon as Mrs. Patenaude learned of that contingent liability and the probability that it would become actual, she immediately placed her first deeds of record, which she had a perfect right to do.

It is to be borne in mind that, when they were placed on record, no judgment had been rendered against Mr. Patenaude. Mrs. Patenaude was not responsible in any sense for the making of the deeds of the 10th of May, 1926. They did not affect her rights in the least, and she was in no way a party to making them.

I will grant the prayer of the complaint as to the two deeds made on September 27, 1926, and the property conveyed by them, and will deny it as to the other deeds and property.

Findings and decree in accordance with this opinion may be drawn and submitted.